UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| SHOE-BAR RANCH, INC. and | § | |
| PATSY WARD, AS TRUSTEE OF THE | § | |
| EIDSON TRUST, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Case No. 7:17-cv-00210-DC |
| | § | |
| PREFERRED PROPPANTS, LLC, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S
RENEWED AND SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Shoe-Bar Ranch, Inc. and Patsy Ward, as Trustee of the Eidson Trust (collectively "Shoe Bar") file this Response to Defendant Preferred Proppants, LLC's ("Preferred") Renewed and Supplemental Motion for Summary Judgment and, in support of same, respectfully show the Court the following:

**I.     INTRODUCTION**

This is Preferred's second motion for summary judgment. The Court denied the first in March. Now that discovery has concluded, Preferred renewed its motion in an attempt to circumvent the jury process. However, there are genuine issues of material fact as to: (1) whether a reasonable person would be satisfied that Shoe Bar held title to the surface estate; (2) whether Preferred raised objections to title as permitted by the parties' agreement; and (3) whether Shoe Bar cured those objections or was excused from doing so. Namely, the discovery shows:

1.     Preferred entered into an agreement to buy the surface estate of Shoe Bar Ranch to use for frac sand production. Shoe Bar has owned the surface estate without dispute since 1970. Preferred's experts both confirm that Shoe Bar owns the surface estate.

2. The agreement limited Preferred's right to terminate. Preferred could terminate only if Shoe Bar did not have good title to the surface estate or if certain, limited objections to title were not cured. The agreement prohibited Preferred from terminating the agreement for operational or geological concerns. Knowing this limitation, Preferred decided that if the "land proves to be worthless to us due to geology review," then Shoe Bar "won't be able to produce clean title."

3. Although Preferred could not terminate the contract based on operational or geological concerns, Preferred threatened to terminate the contract if Shoe Bar did not allow it to conduct operational and geological due diligence before closing. Shoe Bar granted Preferred access to conduct due diligence. The evidence suggests that Preferred was unhappy with the results of its due diligence.

4. Preferred entered into different frac sand leases on land near Shoe Bar Ranch after executing its contract with Shoe Bar but before closing. These leases satisfied Preferred's business needs in the Permian Basin.

5. Preferred agreed to accept the condition of the Ranch "as is" and not to raise objections to title related to the mineral estate or various easements. Thirty days before closing, Preferred raised over 40 objections it claimed were to title. These objections related to the mineral estate, various easements, or the condition of the property. Or, the objections related to title insurance coverage and not title.

6. Nevertheless, Shoe Bar worked to cure the objections. On the date of closing, Shoe Bar held good title to the surface estate. Shoe Bar had cured all permitted objections to title to the surface estate or was excused by the contract from doing so.

Therefore, summary judgment would be an inappropriate resolution to this matter, as there are factual questions whether Preferred wrongly terminated the parties' agreement or if Preferred is wrong as a matter of law. This Court should deny Preferred's Motion for Summary Judgment.

## II.    SUMMARY JUDGMENT EVIDENCE

Shoe Bar relies upon the following summary judgment evidence contained in the attached Exhibits and incorporated herein for all purposes:

Exhibit 1    Farm and Ranch Contract

Exhibit 2    Amendment to the Farm and Ranch Contract

Exhibit 3    1970 Warranty Deed

Exhibit 4    Excerpts from the Deposition of Patsy Ward

Exhibit 5          Excerpts from the Deposition of Kevin Beiter (Filed Under Seal)

Exhibit 6          Excerpts from the Report of J. Bushnell Nielsen

Exhibit 7          August 2017 Commitment for Title Insurance

Exhibit 8          Preferred's South Texas Agreements (Filed Under Seal)

Exhibit 9          Excerpts from Deposition of Paul McLean (Filed Under Seal)

Exhibit 10        Preferred's March 1, 2017 Offer Letter to Shoe Bar

Exhibit 11        Preferred's Other West Texas Agreements (Filed Under Seal)

Exhibit 12        January 31, 2017 Email Chain Between Chris Shaknis and Mike O'Neill

Exhibit 13        March 15, 2017 Email Between Mark Sullivan and John A. "Jad" Davis

Exhibit 14        Multiple Emails Regarding Shoe Bar Sand Reserves (Filed Under Seal)

Exhibit 15        September 1, 2017 Letter from Kevin Beiter

Exhibit 16        May 2, 2017 Email Chain Between Tim Ogilvy and Chris Shaknis

Exhibit 17        September 8, 2017 Letter from Tim Ogilvy

Exhibit 18        September 13, 2017 Letter from Joel Ephross

Exhibit 19        September 21, 2017 Letter from John A. "Jad" Davis

Exhibit 20        September 27, 2017 Letter from Joel Ephross

Exhibit 21        Shoe Bar Ranch Property Tax Records

## III.   FACTUAL BACKGROUND

### A.   No One Disputes that Shoe Bar Owns Shoe Bar Ranch.

The Shoe Bar Ranch is an approximately 25,000-acre ranch located in Ector County, Texas. Ex. 1. Shoe Bar Ranch, Inc. has owned the surface estate of the Ranch since January 1, 1970. Ex. 3. Shoe Bar is the only entity that pays property taxes on the Ranch. Ex. 21. The Ranch is a surface-estate only ranch, and neither Shoe Bar Ranch, Inc. nor the Eidson Trust have ever owned any portion of the mineral estate associated with the ranch lands. Ex. 4 at 43.

The ownership of Shoe Bar Ranch is not actually in dispute. Preferred's experts, Kevin Beiter and J. Bushnell Nielsen, both agree that Shoe Bar owns the surface estate. Mr. Beiter confirmed in his deposition that Shoe Bar owns the Ranch. Ex. 5. In Mr. Nielsen's expert report, he states "Shoe-Bar Ranch, Inc. and Patsy Ward, as trustee of the Eidson Trust, own the surface estate for a number of contiguous parcels in Ector County, Texas that, collectively, have an area of about 25,500 acres." Ex. 6. The title insurance commitment placed record title of the Ranch in Shoe Bar, and Preferred has never objected to this recitation of title. Ex. 7.

**B.     Preferred and Shoe Bar Entered into a Surface-Only Sale of the Ranch.**

On or around March 3, 2017, Preferred and Shoe Bar executed a Texas Real Estate Commission Farm and Ranch Contract (the "Agreement") whereby Preferred agreed to purchase Shoe Bar Ranch. Ex. 1. Preferred entered into the Agreement because it intended to commercially mine and sell sand from the ranch for use in oil and gas development (*i.e.* frac sand). *Id.* Frac sand is part of the surface estate.[1] *Id.*

In Exhibit A of the Agreement, the parties agreed that it was a "Surface Estate Only" sale. *Id.* at sub-Ex. A. In Exhibit B, the parties agreed that Shoe Bar would "reserve all rights, title and interest in and to all oil, gas, and other minerals for Seller and Seller's heirs, successors and assigns. The Special Warranty deed to be delivered by Seller at closing will reserve all oil, gas and other minerals; all oil and gas royalties; all production payments; and all other rights to payment and ownership attributable to the mineral estate." *Id.* at sub-Ex. B, ¶ 2. By entering into the Agreement, Preferred agreed to purchase a surface estate that was severed from the mineral estate.

---

[1] Sand is part of the surface estate. *See Moser v. U.S. Steel Corp.*, 676 S.W.2d 99, 102 (Tex. 1984); *Praeletorian Diamond Oil Ass'n v. Garvey,* 15 S.W.2d 698 (Tex. Civ. App.—Beaumont 1929, writ ref'd). *See also* Ex. 1 at sub-Ex. B, ¶ 11 ("Buyer and Seller agree and stipulate that sand, crushed rock and gravel are attributes of the surface estate and Sellers will not claim that sand, crushed rock and gravel are attributes of the mineral estate.").

Preferred agreed to accept the condition of the Ranch "as is." *Id*. at ¶ 7. Preferred also agreed that it could not raise any objections or terminate the Agreement based on the quality of the frac sand resources. *Id*. at sub-Ex. B, ¶ 9. In fact, the Agreement only had two narrow termination rights, both of which had to do with title to the surface estate. First, the Agreement stated:

> The obligations of Buyer under this Purchase Agreement are contingent upon Buyer determining, in its sole discretion, that the Seller has good title to (and the ability to convey to Buyer) the frac sand resources on the Property. If, on or prior to the closing, Buyer gives notice to Seller of the failure of this contingency, then this Purchase Agreement shall terminate, all earnest money shall be returned to Buyer and neither party shall have any further obligations under this Purchase Agreement.

*Id*. at sub-Ex. B, ¶ 8. Second, Paragraph 6(d) of the Agreement, as later amended by the parties, created a procedure for Preferred to object to certain, permitted title issues:

> Buyer may object in writing to (i) defects, exceptions, or encumbrances to title disclosed on the survey other than items 6A(1) through (5) above; or disclosed in the Commitment other than items 6A(1) through (6) above;. . . or (iii) any exceptions which prohibit the following use or activity: **Ranching, Farming, Hunting, Sand Mining, Gravel Mining, Rock Mining**. . . . Provided Seller is not obligated to incur any expense, Seller shall cure the timely objections of Buyer or any third party lender within 30 days after Seller receives the objections. If objections are not cured within such 30 day period, this contract will terminate and the earnest money will be refunded to Buyer unless Buyer waives the objections.

Ex. 2. The Agreement limited the types of objections Preferred could make to defects, exceptions, or encumbrances to title. Specifically, Item 6(A)(3) of the Agreement prohibited Preferred from objecting to "reservations or exceptions otherwise permitted by this contract." Ex. 1. The Agreement permitted the following exceptions to title: the CRMWD water line easement, various electrical line easements, various pipeline easements, and all recorded easements. Ex. 1 at ¶ 6(e); sub-Ex. B, ¶ 10. The Agreement permitted the following reservations to title: all oil, gas and other minerals, all oil and gas royalties, all oil and gas production payments, all other rights to payment and ownership attributable to the mineral estate, and a cost-free royalty of $0.75 per ton on sand,

crushed rock, and gravel extracted and sold from the Property. Ex. 1 at sub-Ex. B, ¶¶ 2,7. For any objection to title allowed by the Agreement, Shoe Bar then had an obligation to cure said objection, provided it did not have to incur any expense to do so. Ex. 2.

**C.    Preferred Planned to Allege a Title Defect Before It Even Executed the Agreement.**

Previously, Preferred entered into farm and ranch sale contracts more akin to option agreements with inspection periods and broad termination rights. In 2016, Preferred entered into nine farm and ranch contracts with inspection periods for properties in South Texas. Ex. 8. Preferred ran a beauty contest and only moved forward with the best property of the nine, terminating the other contracts. Ex. 9 at 24-28.

Like in South Texas, Preferred entered into multiple West Texas agreements in the Spring of 2017, with Shoe Bar being one of them. Ex. 9 at 20. These agreements had geological due diligence inspection periods. Ex. 11. That is, except for Shoe Bar Ranch. Preferred was well-aware that Shoe Bar would not allow a geological inspection period. Before even making the offer, Preferred discussed internally that Shoe Bar did not want to enter into an inspection period contract. The Director of Preferred asked the CEO, "I was trying to make sure we had some sort of out if the land proves to be worthless to use due to geology review or encumbrances. If we make the offer only subject to clean title and they produce it, are we willing to close on the land regardless of what our land studies show?" Ex. 12. The CEO responded back "They won't be able to produce clean title." *Id*. With this plan in place, Preferred made the offer to Shoe Bar to buy the Ranch with no inspection period and only subject to clean title.

In making its $25,000,000 offer to purchase the Ranch, Preferred represented to Shoe Bar that it intended to close on the Ranch. Preferred stated that "[t]here is no other buyer that has done as much 'homework' as we have to date, providing the most certainty of closure. Our company is

fully prepared to move forward." Ex. 10. Preferred explained that it studied the Ranch extensively

prior to making the offer, including that it "visited the property and did a full site tour," and

"engaged nationally recognized experts who completed full geology and hydrology evaluations of

the property." *Id.* Shoe Bar accepted Preferred's offer.

### D. Preferred Demanded an Inspection Period Before Closing.

Shortly after entering in the Agreement, Preferred demanded access to the Ranch to

conduct operational and geological due diligence. Ex. 13. Although the Agreement did not allow

for a right to terminate based on operational or geological due diligence, Preferred claimed that it

"can't move forward on the Shoe Bar Ranch until we know the locations of the best places to mine

and build a plant." *Id.* Shoe Bar granted Preferred access, and Preferred proceeded to conduct

due diligence, including sand testing. Preferred's testing raised concerns regarding the sand

reserves, yield, and quality, although Preferred now alleges otherwise. Exs. 14; 9 at 45. Shortly

after finishing this testing, Preferred chose to move forward with different sand leases on properties

neighboring the Shoe Bar Ranch. Ex. 9 at 13-14. These leases satisfied Preferred's need for sand

in West Texas. *Id.* at 48.

### E. Despite Shoe Bar Having Clear Title to the Surface, Preferred Claimed Grounds for Termination on Alleged Title Defects.

On April 24, 2017, the title insurance company that the parties jointly chose issued its

proposed commitment for title insurance, which it later amended and reissued in August. Ex. 7.

On September 1, 2017, Preferred raised 44 specific objections to items that the title insurance

company excluded from insurance coverage as well as general objections to the condition of the

property. Ex. 15. These objections are summarized as follows:

Category 1: Preferred objected to 28 oil and gas leases. These leases were executed between 2008 and 2014. Shoe Bar is not a party to any of the leases. The leases were recorded by memorandum. Preferred requested Shoe Bar provide it with copies of the leases or remove the leases from the list of exclusions to title insurance.

Category 2:     Preferred objected to two oil and gas leases.  Preferred claimed that these leases were subject to letter agreements or joint operating agreements.  Shoe Bar is not a party to the leases, the letter agreements, or joint operating agreements.  Preferred requested copies of the agreements from Shoe Bar or for the leases to be removed from the list of exclusions to title insurance.

Category 3:  Preferred objected to one recorded oil and gas lease.  Preferred could not locate the recorded instrument and requested a copy of it.

Category 4:  Preferred objected to seven recorded easements.  Preferred claimed they were incorrectly labeled in the title insurance commitment.  Preferred requested that these easements be correctly labeled or removed from the title insurance commitment.

Category 5:  Preferred objected to three recorded easements.  Preferred claimed that these easements were subject to a letter agreement between Shoe Bar and Duke Energy Field Services, LP.  Preferred requested a copy of this letter agreement from Shoe Bar or for the easements to be removed from the list of exclusions to title insurance.

Category 6:  Preferred objected to excluding from title insurance coverage (a) rights of parties in possession, (b) any easements not disclosed in the public records as to matters affecting title to real property, and (c) any encroachments, encumbrance, violation, variation, or adverse circumstance affecting title that would be disclosed by a survey.

Category 7:  Preferred objected to the condition of the Ranch.  Preferred objected to the presence of gathering, water distribution, and other lines and facilities related to oil and gas located on the Ranch.  Preferred claimed that this could present signification operational limitations on Preferred.

Preferred also objected that it had not received copies of the recorded instruments from the title insurance company.  *Id.*  However, the Agreement required Preferred to pay for these copies, which it never did, and Preferred told the title insurance company not to collect them.  Ex. 16.

On September 8, 2017, the title insurance company responded to each of Preferred's objections and produced a revised title insurance commitment.  Ex. 17.  It corrected or removed the incorrectly labeled easements (Category 4), provided Preferred a copy of the recorded oil and gas lease (Category 3), and agreed to remove the exclusions identified in Category 6 upon a property inspection and survey.  *Id.*  The title company then explained that oil and gas leases (Categories 1 and 2) did not constitute a defect in title to the surface estate and were provided in the commitment for notice purpose only.  *Id.*

In response, Preferred demanded that the only "cures" it would find acceptable for Categories 1 and 2 would be if the oil and gas lessee executed a release, an affidavit of non-production, or a waiver of lessee's surface rights for the oil and gas leases at issue. Ex. 18. Preferred also raised new, untimely objections to the date of the title insurance commitment and demanded that the arbitration clause in the title insurance commitment be deleted. *Id.*

On September 21, 2018, Shoe Bar responded to Preferred's objections. Ex. 19. Like the title company, Shoe Bar addressed each objection. *Id.* Shoe Bar explained how the title company resolved Categories 3, 4, and 6. *Id.* Shoe Bar provided Preferred with the Duke Energy letter agreement in response to Category 5. *Id.* Then Shoe Bar explained that the Agreement prohibited the majority of Preferred's objections because they did not relate to defects, exceptions, or encumbrances to title to the surface estate or identify exceptions that prohibited ranching, farming, hunting, or mining. *Id.* Shoe Bar also explained that, under Texas law, oil and gas leases do not transfer or affect title to the surface estate. *Id.*

By way of the revised title insurance commitment, the title company and Shoe Bar's letters, and the additional documents provided to Preferred, Shoe Bar cured all permitted Paragraph 6(d) objections in a timely manner or was excused by the Agreement from doing so. However, three days before closing, on September 27, 2017, Preferred alleged that it had raised valid title objections, and that, in its opinion, Shoe Bar had failed to cure said objections. Ex. 20. Preferred claimed to terminate the Agreement pursuant to Paragraph 6(d) and Exhibit B, Paragraph 8.

**F.    Shoe Bar Filed Suit and Procedural History.**

On October 4, 2017, Shoe Bar filed a breach of contract claim with a specific performance remedy against Preferred in Texas state court. Preferred removed this action to federal court and brought a counter-claim for declaratory judgment and breach of contract, which Shoe Bar answered. Preferred filed a Motion for Summary Judgment three weeks later, claiming that the

contract was illusory or, in the alternative, there was no evidence to support the breach. This Court denied Preferred's motion (ECF 21). The Court determined that the contract was not illusory as a matter of law. The court denied the no-evidence portion of the Motion as premature and acknowledged that whether Preferred breached the contract was likely a question of fact. Discovery is now complete and Preferred has re-urged its no-evidence motion. This matter is set for trial on December 4, 2018.

## IV.  ARGUMENT AND AUTHORITIES

### A.  Summary Judgment Standard.

There are three questions in this case: (1) under Exhibit B, Paragraph 8, would a reasonable person would be satisfied that Shoe Bar held good title to the surface estate; (2) under Paragraph 6, did Preferred raise objections to title as permitted by the Agreement; and (3) under Paragraph 6, did Shoe Bar cure those permitted objections or did the Agreement excuse Shoe Bar from doing so? Preferred incorrectly claims all three can be answered on summary judgment.

A court should grant summary judgment only if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In making this determination, the court should consider the evidence in the light most favorable to the opposing party. *Harvey v. Great Atl. & Pac. Tea Co*., 388 F.2d 123, 124 (5th Cir. 1968). Uncontradicted and unimpeached evidence supporting the moving party should be considered only to the extent "that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A court should not "cut off [Plaintiffs] from their right to trial by jury if they really have issues to try." *Harvey*, 388 F.2d at 124. "Credibility determinations, the weighing of evidence, and the drawing of legitimate interferences from the facts are jury functions, not those of a judge." *Reeves*,

530 U.S. at 150. "If reasonable minds could draw different inferences and reach different conclusions from the facts, the issue must be reserved for trial." *Harvey*, 388 F.2d at 125.

> **B.      A Factual Dispute as to Paragraph 8 Precludes Summary Judgment.**

Exhibit B, Paragraph 8 of the Agreement makes Preferred's obligation to close contingent upon Preferred "determining, in its sole discretion, that the Seller has good title to (and the ability to convey to Buyer) the frac sand resources on the Property." Ex. 1. This Court determined in March that the appropriate standard to apply is whether a reasonable person would be satisfied that Shoe Bar has good title to the frac sand resources. ECF 21 at 17-18. "'This is an objective standard which does not seek to find the mental state of satisfaction of that party, but rather whether the performance would satisfy a reasonable person.'" *Clover Staffing, LLC v. Johnson Controls World Servs., Inc*., 465 F. Supp. 2d 670, 684 (S.D. Tex. 2006) (quoting *Cranetex, Inc. v. Precision Crane & Rigging of Houston, Inc*., 760 S.W.2d 298 (Tex. App.—Texarkana 1988, writ denied)). As multiple courts have found, and as this Court acknowledged in March, this is a question of fact, which generally must be answered by the jury. ECF 21 at 18; *Comm'ns Transmission, Inc. v. Tristar Comm'ns, Inc*., 798 F. Supp. 406, 409 (W.D. Tex. 1992) (citing *Anahuac, Inc. v. Wilkes*, 622 S.W.2d 634, 637 (Tex. App.—Austin 1981, no writ)) (denying motion for summary judgment because of a factual dispute as to whether buyer terminated contract in good faith pursuant to a satisfaction clause); *see also Clover Staffing,* 465 F. Supp. 2d at 684 (same); *Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180, 185 (Tex. Civ. App.—San Antonio 1964, writ ref'd n.r.e.) (refusing to accept a buyer's opinion that it terminated the contract in good faith as summary judgment evidence).

Like in the cases cited above, summary judgment must be denied because a jury should decide whether a reasonable person would be satisfied that Shoe Bar held good title to the frac sand resources. Breaking down this requirement, title "speaks to ownership of rights in property,

not the condition or value of the property." *McGonagle v. Stewart Title Guar. Co.*, 432 S.W.3d 535, 540 (Tex. App.—Dallas 2014, pet. denied). "Good title" means "title that is legally valid or effective." TITLE, Black's Law Dictionary (10th ed. 2014). It is undisputed that the frac sand resources are part of the surface estate. Ex. 1 at sub-Ex. B, ¶ 11. Therefore, the question is whether a reasonable person would be satisfied that Shoe Bar legally owned the surface estate.

Viewing the facts in the light most favorable to Shoe Bar, the record shows:

- Since 1970, Shoe Bar has held title to 100% of the surface estate. Ex. 3.

- Preferred's experts Kevin Beiter and J. Bushnell Nielsen both opined that Shoe Bar owned the surface estate of the Ranch. Exs. 5; 6.

- Shoe Bar is the only entity that pays property taxes on the Ranch. Ex. 21.

- The title insurance commitment identified Shoe Bar as the owner of the surface estate of Shoe Bar Ranch. Preferred never objected to this recitation of record title. Ex. 7.

- No one has possessed or claimed to possess the Ranch other than Shoe Bar since 1970. Ex. 19.

There is also evidence that Preferred failed to act as a reasonable person in claiming Shoe Bar did not own the surface estate. Preferred entered into multiple agreements or letters of intent to purchase or lease frac sand properties in West Texas besides Shoe Bar Ranch. Ex. 11. Preferred closed on another transaction in summer of 2017, which satisfied its need for sand in the Permian Basin. Ex. 9 at 48-49. Preferred entered into the Agreement intending to allege Shoe Bar did not have good title as an excuse if it wanted to terminate the Agreement. Ex. 12.

Moreover, the opinions of Preferred's experts and corporate representative that a reasonable person would not have been satisfied is not competent summary judgment evidence because that testimony does not come from disinterested witnesses. *Reeves*, 530 U.S. at 151; *Atomic Fuel*, 385 S.W.2d at 185. Preferred also claims that Patsy Ward and Chad Dugger did not identify evidence of Preferred's bad faith. However, Preferred's intentions and motives are

uniquely in the purview of Preferred. Without Shoe Bar's attorneys providing Ms. Ward and Mr. Dugger with Preferred's document production (much of which was designated "Attorneys' Eyes Only" pursuant to the Protective Order), Ms. Ward and Mr. Dugger would not have knowledge of Preferred's intentions and motives. Thus, there is clearly evidence that a reasonable person would be satisfied that Shoe Bar legally owned the surface estate, and Preferred did not act reasonably when it claimed otherwise. The jury and not this Court must weight this evidence.

### C. Whether Preferred Raised Allowed Objections is Disputed.

A dispute also exists as to whether Paragraph 6(d) of the Agreement permitted Preferred's objections. This dispute will have to be resolved by a jury or by the Court as a matter of law. First, though, the Court must determine what objections the Agreement allowed.

*(i) The Contract Does Not Allow Objections to Mineral Leases, Various Easements, or Property Condition.*

Under Texas law, a Court's duty in construing a contract is to discern "the parties' intent as expressed within the [contract's] four corners," *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002) (citing *Yzaguirre v. KCS Resources, Inc.*, 53 S.W.3d 368, 372-73 (Tex. 2001); *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991)), and to "give the [contract's] language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions," *id.* (citing *Fox. v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966)). Courts must "examine the entire [contract] and attempt to harmonize all its parts." *Id.* (citing *Luckel*, 819 S.W.2d at 462). "Ultimately, courts must enforce contract terms as written and may not rewrite contracts or add to their language under the guise of interpretation." *Weaver v. Jamar*, 383 S.W.3d 805, 811 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Courts simply may not alter a contract's "plain terms to give [parties] the benefit of a bargain they never made." *Yzaguirre*, 53 S.W.3d at 374.

Here, this Court must interpret the plain language of the Agreement and harmonize all parts to determine what type of objections the Agreement allowed Preferred to make. Paragraph 6(d), as amended, lists two categories of objections. The first is an objection to defects, exceptions, or encumbrances to title other than reservations or exceptions otherwise permitted by the Agreement.

The Objection Must Be to Title. Title means ownership of the property. *McGonagle*, 432 S.W.3d at 540. The property in question here is the Shoe Bar Ranch surface estate. The parties affirm in two different places in the Agreement that it is a surface estate only contract. So, the objection must be to who owns the surface estate.

The Objection Must Arise from a Defect, Encumbrance, or Exception to Title. Moreover, the objection must arise from a defect, encumbrance, or exception to who owns the surface estate. Defect, encumbrance, or exception to title each have a specific legal meaning. A defect to title is a "flaw in the ownership rights of the property." *McGonagle*, 432 S.W.3d at 540. The instrument at issue must vest ownership in property to create a title defect. *Id.* An encumbrance to title is a "tax, assessment, or lien on real property." *Id.* (citing TEX. PROP. CODE § 5.024). An exception to title is an exclusion from the grant of title. *Pich v. Lankford*, 302 S.W.2d 645, 650 (Tex. 1957).

The Objection Cannot Arise from a Permitted Reservation or Exception. Preferred agreed that it would not raise objections to the exceptions or reservations otherwise permitted by the Agreement. The exceptions to title otherwise permitted by the Agreement are the water easement, various electrical easements, various pipeline easements, and all recorded easements. The reservations to title permitted by the Agreement are the mineral estate and the sand royalty.

Interpreting the plain meaning of the first objection, the Agreement allowed Preferred to object to flaws in ownership of the surface estate; taxes, assessments, or liens affecting ownership

of the surface estate; or exclusions from the grant of title to the surface estate; provided that those objections did not arise from the mineral estate, the sand royalty, or various easements.

Preferred argues that this first objection allowed Preferred to object to items the title insurance company excluded from title insurance coverage. In doing so, Preferred conflates "exceptions to title" with "exceptions to title insurance." These are two different concepts. Under Texas law, a title commitment is nothing more than an insurance contract. It is not a title abstract or opinion. As the Texas Supreme Court explained, a "title insurance policy is a contract of indemnity. In other words, the only duty imposed by a title insurance policy is the duty to indemnify the insured against losses caused by defects in title." *Chicago Title Ins. Co. v. McDaniel*, 875 S.W.2d 310, 311 (Tex. 1994). A title insurance commitment does "not constitute a representation regarding the status of the property's title; rather, it constituted an agreement to indemnify the McDaniels against losses caused by any defects." *Id.* Or, as Preferred's expert Nielsen explains in his book on the subject, a "title insurer is not an abstractor of title, and has no duty to examine title. The commitment is not an abstract; the policy is not a representation of the status of title." Ex. 6.

The Agreement allowed Preferred to make objections to exceptions to title—*i.e.,* objections to what would be excluded from the grant from Shoe Bar to Preferred. To the extent that the mineral estate was excluded from the grant from Shoe Bar to Preferred, Preferred agreed to this exclusion in the Agreement. Ex. 1 at sub-Exs. A; B, ¶ 2. Even more importantly, Preferred explicitly waived its right to raise objections arising out of the exclusion of the mineral estate. *Id.* at ¶ 6(A)(3).

The Agreement did not allow Preferred to make objections to exclusion to title insurance— *i.e.* objections to whether the title insurance company would cover "loss, costs, attorneys' fees,

and expenses" resulting from the excepted issue. Ex. 7. As the title insurance company explained to Preferred, a mineral estate lease is not a defect to title to the surface estate. Ex. 17. The company's decision not to assume the risk of loss does not mean under Texas law that there was a defect, encumbrance, or exception to title. *Chicago Title*, 875 S.W.2d at 311. Nor was the title insurance company required to assume this risk. The Texas Insurance Code does not require an insurer to insure a "loss from damage resulting from the use of the surface of the land for the extraction or development of coal, lignite, oil, gas or another mineral." TEX. INS. CODE § 2703.0515.

The second type of objection allowed by the Agreement is an objection to an exception that prohibits ranching, farming, hunting, sand mining, gravel mining, or rock mining. "Prohibit" means to forbid by authority, enjoin, or prevent from doing. PROHIBIT, Merriam-Webster Dictionary (9th Ed. 1987). Further, Preferred agreed to accept the condition of the property "as is." Ex. 1 at ¶ 7. "By agreeing to purchase something "as is", a buyer agrees to make his own appraisal of the bargain and to accept the risk that he may be wrong. *Prudential Ins. Co. of Am. v. Jefferson Associates, Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995) (citing *Mid Continent Aircraft Corp. v. Curry County Spraying Serv. Inc.*, 572 S.W.2d 308, 313 (Tex.1978)). "The seller gives no assurances, express or implied, concerning the value or condition of the thing sold." *Id.* Harmonizing the Agreement, while Preferred may make objections to exceptions that enjoin frac sand mining, those objections cannot be based on the condition of the Ranch.

     *(ii)       There is a Question Whether Preferred Make Permitted Objections.*

It must be decided by a jury or as a matter of law whether the Agreement permitted Preferred to make objections to oil and gas leases and development (Categories 1, 2, and 7).[2]

---

[2] In its Motion, Preferred appears to concede that Shoe Bar cured its Category 3, 4, 5, and 6 objections. However, to the extent that this is inaccurate, whether the Agreement permitted these objections and whether Shoe Bar cured them

Preferred objected to over 30 oil and gas leases that the title insurance company excluded from title insurance coverage. Ex. 15. Shoe Bar is not a party to any of these leases. Preferred also made a general objection to the condition of the property because of oil and gas development. *Id.* Preferred claimed that the existence of oil field infrastructure on the ranch would create operational limitations on Preferred. *Id.*

The Agreement bars Preferred from making objections arising out of the mineral estate. Further, to the extent that existing oil and gas activity may interfere with frac sand mining, (1) interfere is different than prohibit, and (2) Preferred could not, after agreeing to accept the Ranch "as is," object to an existing and observable use of the land. *Prudential Ins.,* 896 S.W.2d at 161. Weighing the evidence, a jury should find that these objections are not allowed by the Agreement.

What Preferred complains of is that it was purchasing a surface-estate only property, with no control over the mineral estate. Texas allows for the mineral estate and surface estate to be severed into "two separate and distinct estates," meaning that title to the mineral estate may be owned by a separate person than title to the surface estate. *Acker v. Guinn*, 464 S.W.2d 348, 352 (Tex. 1971). This is what happened to Shoe Bar Ranch—title to the mineral estate started being severed from the surface estate in the 1920s and the severance was complete by 1970. Exs. 3; 4. While Shoe Bar has been the only person to own the surface estate for close to 50 years, multiple people own title to the mineral estate. Exs. 4; 7.

Preferred argues that oil and gas leases impact title to the surface estate through the dominant estate doctrine or that the dominant estate doctrine enjoins frac sand development. Preferred misunderstands the dominant estate doctrine. Texas law historically has "held that the mineral estate is dominant, meaning, the mineral owner has the <u>right to use</u> so much of the surface

---

are also questions for trial. And, to the extent that Shoe Bar has not addressed an objection of Preferred's in this Response, these objections must also be assessed at trial for the reasons set forth in this Response.

as may be reasonably necessary to enjoy his mineral estate." *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 788 (Tex. 1995) (emphasis added). This is because "practically speaking, the mineral estate would be wholly worthless if the owner of the minerals could not enter upon the land in order to explore for and extract them." *Id.* at 788-89. The dominant estate doctrine is a use doctrine. It impacts use of the surface estate, not title to the surface estate. The Agreement does not grant Preferred rights to object based on the use or condition of the surface estate.

The Agreement clearly states that Preferred would only have title to the surface estate. Ex. 1 at sub-Exs. A; B, ¶ 2. Parties are presumed to know the law when they enter into a contract, including that a mineral estate is the dominant estate. *Philadelphia Indem. Ins. Co. v. White*, 490 S.W.3d 468, 483 (Tex. 2016). Therefore, Preferred is presumed to have known that the mineral estate would have the right to use the surface estate when it entered into the Agreement (rather than being something disclosed in the survey or title insurance commitment). And, because the dominant estate doctrine comes from Texas law and because Preferred entered into a surface-only contract, the dominant estate doctrine would impact the surface estate whether there were multiple oil and gas leases or none.

Further, even though the mineral owner holds the dominant estate, he must exercise his use of the surface with due regard for the rights of the surface owner. *Getty Oil Co. v. Jones*, 470 S.W.2d 618 (Tex. 1971). The dominant estate doctrine does not allow the mineral estate holder to destroy or substantially impair the utility of the surface. *Acker*, 464 at 352; *see also Plainsman*, 898 S.W.2d at 789 (stating that the dominant estate doctrine cannot be used to create a surface estate "with little or no value"). And with directional drilling creating reasonable alternative drilling methods, oftentimes "an accommodation [of the surface estate] by the minerals owners

would be *required*." *Valence Operating Co. v. Texas Genco, LP*, 255 S.W.3d 210, 216 (Tex. App.—Waco 2008, no pet.).

Additionally, once the mineral estate has been severed from the surface estate, the burden placed upon the surface estate for the benefit of the mineral estate cannot be expanded by some subsequent agreement of the mineral owner alone. *See, e.g., Robinson v. Robbins Petroleum Corp.*, 501 S.W.2d 865 (Tex. 1973). Put another way, since Shoe Bar was not a party to any of the objected-to leases and because the leases were executed after the severance of the mineral estate from the surface estate, the oil and gas leases could not contain terms that would prohibit the use of the surface estate outside of the common-law dominant estate doctrine.

Preferred knew it was purchasing a surface-only estate. It chose to waive its rights to object to the mineral estate or the condition of the Ranch. The dominant estate doctrine impacts use of the surface, not title, and is tempered by the accommodation doctrine. Therefore, there is a question for trial whether Preferred objected to defects, encumbrances, or exceptions to title to the surface estate when it objected to oil and gas leases and development.

**D.      There is a Question if Shoe Bar Cured the Permitted Objection or Was Excused from Doing So.**

If it is determined that the Agreement did not allow for objections arising out of oil and gas leases, then Shoe Bar would not have had an obligation to cure said objections. However, if determined otherwise, then it must be decided if Shoe Bar cured the objections or was excused from doing so. The Agreement does not require Shoe Bar to cure any objections if it would have to incur a cost to do so. Ex. 2. A jury should also determine whether the cures demanded by Preferred were reasonable or within Shoe Bar's ability to obtain.

To cure a title objection means to "remove one or more legal defects to correct one or more legal errors. For example, curing title involves removing defects from title to unmarketable land

so that title becomes marketable." CURE, Black's Law Dictionary (10th ed. 2014). The summary judgment record shows that title to the surface estate of the Ranch did not have legal errors on the date of closing. See Exs. 17; 19.

Without admitting the validity of the objections, Preferred complains that the only acceptable cures would have been for Shoe Bar to obtain copies of the oil and gas leases at issue or obtain a release, an affidavit of non-production, or a waiver of lessee's surface rights from the oil and gas companies. Exs. 15; 18. These cures would be near impossible for Shoe Bar to obtain. Shoe Bar is not a party to any of the leases. As Preferred's expert explains, if there is no privity of contract, a party is unlikely to get a copy of a lease, as the lessor and lessee have "no duty or inclination to deliver copies of such leases." Ex. 6. Similarly, a lessee would be unlikely to give up its contractual rights and 100 years of common law rights under an oil and gas lease without consideration. Ex. 19. Moreover, Shoe Bar had to pay counsel to try and obtain the leases. To obtain any release, affidavit, or waiver would involve negotiating and drafting the instruments. The jury is entitled to hear evidence as to whether the cures required by Preferred were reasonable and whether Shoe Bar would have incurred costs to obtain, thus excusing it from performance.

Therefore, based on the record before the court, these are genuine issues of material fact as to whether Preferred improperly terminated the Agreement. Summary Judgment would be an inappropriate resolution to this case and must be denied. *See Clover*, 465 F. Supp. 2d at 684; *Comm'ns Transmission, Inc*, 798 F. Supp. at 410.

## V.    PRAYER

Wherefore, premises considered, Plaintiffs Shoe Bar Ranch, Inc. and Patsy Ward, as Trustee of the Eidson Trust respectfully pray that this Court deny Preferred Proppants, LLC's Renewed and Supplemental Motion for Summary Judgment and also request such other and further relief to which they are justly entitled, either at law or in equity.

Respectfully submitted,

**DAVIS, GERALD & CREMER**
**A Professional Corporation**
400 W. Illinois, Suite 1400
Midland, Texas 79701
(432) 687-0011
(432) 687-1735 (Fax)

By: _/s/ John A. "Jad" Davis_
    John A. "Jad" Davis
    State Bar No. 05511400
    jadavis@dgclaw.com

    Julie L. Griffis
    State Bar No. 24070032
    jlgriffis@dgclaw.com

**ATTORNEYS FOR PLAINTIFFS SHOE BAR RANCH, INC. and PATSY WARD, AS TRUSTEE OF THE EIDSON TRUST**

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of September 2018, a copy of the foregoing was served on the following:

VIA E-SERVICE
Thomas W. Sankey, P.C.
Wesley W. Yuan
Duane Morris LLP
1330 Post Oak Blvd., Suite 800
Houston, TX 77056
(713) 402-3900
(713) 402-3901 (Fax)
twsankey@duanemorris.com
wwyuan@duanemorris.com

VIA E-SERVICE
Harper Estes
Lisa K. Hooper
Lynch, Chappell & Alsup, P.C.
300 N. Marienfeld, Suite 700
Midland, TX 79701
hestes@lcalawfirm.com
lhooper@lcalawfirm.com

_/s/ John A. "Jad" Davis_
John A. "Jad" Davis